UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALMA PLUCINSKI,<br><br>     Plaintiff,<br><br>v.<br><br>PAYETTE COUNTY; PAYETTE COUNTY BOARD OF COMMISSIONERS; PAYETTE COUNTY PLANNING AND ZONING COMMISSION; CHAD HENGGELER in his official and individual capacity; BERT OSBORN in his official and individual capacity; GARRY TOTH in his official and individual capacity; and DOES I-X,<br><br>     Defendants. | Case No. 1:16-cv-00153-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Defendants' motion for summary judgment. (Dkt. 35.) This matter involves a civil rights claim brought by Alma Plucinski (referred to also as Alma Hasse) against Payette County, the Payette County Board of Commissioners, the Payette County Planning and Zoning Commission, Chairman Chad Henggeler, attorney Bert Osborn, and Officer Garry Toth. Plucinski claims her constitutional rights were violated when she was removed from a city council meeting on October 9, 2014, charged with trespass and obstruction and delay of an officer, and later jailed as a result. The

Complaint contains five causes of action brought pursuant to 42 U.S.C. § 1983: violation of the First Amendment against Payette County Defendants, Henggeler, and Osborn; violation of the Fourth Amendment (unlawful seizure) against Payette County Defendants, Henggeler, Osborn and Toth; violation of state law and 42 U.S.C. § 1983 (false arrest and imprisonment) against all Defendants; violation of state law and 42 U.S.C. § 1983 (malicious prosecution) against Osborn; and intentional infliction of emotional distress against all Defendants.

The Court conducted a hearing on the motion on December 4, 2017, at which the parties appeared and presented their arguments. After the hearing, the Court ordered certain audio files submitted by the parties and contained in the record to be transcribed. (Dkt. 54, 56.) Given the importance of the audio recordings to a resolution of this matter, the Court gave the parties an opportunity to review the transcript and to file supplemental briefing. (Dkt. 56, 57, 59, 60.) The parties submitted their supplemental briefs on February 8, 2018, and the matter was thereafter taken under advisement.

After carefully considering the record before the Court, the parties' written memoranda, relevant case law, and the parties' arguments, the Court will grant Defendants' motion summary judgment.

# FACTS

Plaintiff recorded the city council meeting held on October 9, 2014, using a phone camera.[1] The facts are gleaned from the record in this case, including the various video and audio recordings provided by the parties, which recordings were later transcribed. (Dkt. 54, 56.)

Plucinski has been an outspoken critic of Alta Mesa Idaho, LLC's proposal to operate a natural gas and hydrocarbon liquid treatment facility on property located in New Plymouth, Idaho. (*See* Dkt. 43-11 at 2-3.) The Planning and Zoning Commission held a public hearing on September 11, 2014, during which it considered Alta Mesa's request to either rezone or obtain a conditional use permit to operate the facility. (Dkt. 43-3 at 2.) Alta Mesa proposed to use the rail line located near the property to transport hydrocarbon waste. Plucinski's testimony at the September 11 meeting concerned perceived safety issues presented by using rail transportation rather than trucks to transport hydrocarbon from the property. (Dkt. 43-6 at 3.) She testified that the City of Santa Barbara did not allow rail traffic to haul the product out, and insisted that the City of Santa Barbara required the product be carried by trucks. (*Id.*) Plucinski expressed her opposition to Alta Mesa's proposal to use the existing rail line in Payette County based, in part, upon what the City of Santa Barbara had done under similar circumstances. (*Id.*)

---

[1] The recording is in the record at Docket 35-2, Ex. A. The Court had the recording, as well as several other recordings, transcribed. (Dkt. 54, 56.) The parties were given the opportunity to review the transcripts and to file supplemental briefing. (Dkt. 59, 60.)

At the conclusion of the public portion of the meeting, the Commission discussed Alta Mesa's various applications, and potential conditions of approval. (Dkt. 43-7 at 5.) The Commission voted unanimously in favor of granting the conditional use permit for the gas rail loading facility, to include recommended conditions regarding the maximum decibel level. (Dkt. 43-7 at 9.)

The next regular meeting of the Commission was called to order on October 9, 2014. (Dkt. 43-8 at 2.) Alta Mesa's conditional use permit, as amended, to operate a natural gas and hydrocarbon liquid treatment facility was again on the agenda, and a public hearing was held. *See* Plucinksi Decl. ¶10. (dkt 43-25 at 3.) Plucinski was in attendance, and provided testimony during the public portion of the meeting. (Dkt. 43-8 at 5.) She voiced her concern that "some Planning and Zoning Commission members have leases with Alta Mesa and stand to gain financially, which should be disclosed to the public." (Dkt. 43-8 at 5.) During the discussion which ensued later in the meeting, Commissioner Morgan commented on the assertion that Commission members needed to disclose their leases to Alta Mesa and asked for clarification of the issue. (Dkt. 43-8 at 7.) Thereafter, a motion was made and approved as to the request to amend the conditional use permit submitted by Alta Mesa. (*Id.*)

Later in the meeting, after the public comment portion had closed, the minutes reflect the Commission considered "other" business. (Dkt. 43-8 at 10.) The minutes indicate Henggeler commented that, once the Commission takes action and makes a decision, it cannot go back and "fact-check information that was presented for their consideration," and that he thought it would be prudent if the Commission requested

additional documentation from those who testified at public meetings if a situation

warranted it. (Dkt. 43-8 at 11.) Henggeler cited as an example "testimony given at the

September 11, 2014 public hearing," and asked Morgan to comment. (Dkt. 43-8 at 11.) It

is at this point that the video recording of the October 9, 2014 meeting begins.

The video depicts the chairman of the Planning and Zoning Commission, Chad

Henggeler, in the center of a courtroom, presiding over the meeting. The Commissioners

are seated in the area usually reserved for a jury. Morgan then talks about Plucinski's

testimony from the September meeting concerning the City of Santa Barbara not allowing

rail transportation of gas liquids through the city. Morgan recounts a telephone

conversation he had with someone in the planning and zoning department in Santa

Barbara to follow up on that testimony, and states that he learned the City of Santa

Barbara had no such ordinance prohibiting rail cars with such liquids from traveling

through town. (Dkt. 43-8 at 11, Dkt. 54 at 4-5.)[2]

In response to Morgan's comments about his phone conversation with an

individual from the Santa Barbara planning and zoning department, Plucinski interrupts

loudly, asking "who did you speak to?" Morgan does not respond to Plucinski's question,

---

[2] The Payette County Planning and Zoning Commission administrator informed attorney Bert Osborn about Morgan's independent inquiry via an email dated October 7, 2014. (Dkt. 43-9 at 3.) The administrator asked what could be done about false testimony. Osborn responded, "If you lie under oath, you commit perjury….Pete should file a police report… and ask that she be prosecuted for perjury. I doubt if the PA's office will do anything, but…in the future we can simply dismiss out of hand anything that Alma says and we let her know that we know she is not a truthful person…." The administrator forwarded Osborn's comments to the members of the Commission, suggesting that they obtain verification from the City of Santa Barbara. (Dkt. 43-9 at 2.) It does not appear that any further action was taken.

and continues speaking. Another audience member whispers to Plucinski, "planning and zoning." Plucinski retorts, "Yeah, but I want a name." At the other end of the room, Morgan continues to give his presentation. (Dkt. 54 at 5.) Morgan states that he "didn't want these hearings—to come to the point where it's who can show up and tell the biggest whopper…." (Dkt. 43-8 at 11; Dkt. 54 at 5-6.)[3]

At this point, Plucinski yells loudly, "Point of order, if somebody is going to say—accuse me of giving bad information, I would like a name." Osborn, visible on the left side of the screen, stands and states, "You do not have standing to make a point of order. Alma, you need to leave."[4] Plucinski responds, "I'm not leaving." Osborn directs his next comment toward Henggeler, and asks, "can we get the Sergeant-at-Arms to have her

---

[3] *See also* Meeting Minutes. (Dkt. 43-8 at 11). The minutes reflect that:

Morgan voiced concern that the prior Planning and Zoning minutes reflect something that is not factual. Alma Hasse disrupted the meeting to ask who Morgan spoke to. Morgan said he did not want the meetings to get to the point of seeing who could show up and tell the 'biggest whopper.' Hasse called for point of order, continuing to disrupt the meeting. Osborn advised Hasse she does not have standing to make a point of order. Hasse continued, saying if Morgan is saying she gave bad information, she would like a name. Osborn responded, telling Hasse she needed to leave the meeting. Hasse refused to leave. Osborn asked Henggeler if the Sargent-At-Arms could be called to remove Hasse from the meeting. Henggeler asked Harvey to go to the Sheriff's office and request assistance from a deputy. Hasse continued to loudly protest.

The remainder of the meeting minutes summarize what is reflected in the transcript.

[4] Plaintiff chose to characterize Osborn's statement as "shouting," using all capitals and explanation marks to emphasize the point. The Court will let the video recording and transcript speak for themselves.

removed?" Henggeler replies, "yes," and Sergeant-at-Arms Mark Harvey then stands and leaves the room. (Dkt. 54 at 6.)[5]

The Commissioners continue their discussion. Plucinski then states loudly, "so that's real fair, isn't it? Just giving generic names without an opportunity for other people to contact and find out, that's really fair. That's really acting in the public's best interest, isn't it?" (Dkt. 54 at 6.) Morgan can be heard saying, "I've lost my train of thought." Plucinski next hands the camera phone to someone else in the audience, asking "Gina" to "keep recording." (Dkt. 54 at 7.)

Harvey returns to the meeting room with Jailer McDonald. Henggeler instructs McDonald: "We would like her removed from the meeting—in the back." (Dkt. 54 at 7.) McDonald proceeds to the back of the room where Plucinski is standing against the back wall. Plucinski states loudly, "It's a public meeting." McDonald approaches Plucinski, and states,[6] "Okay. They asked you to leave." Plucinski responds, "I stood up, asked for a point of order, because somebody's accusing me basically of being a liar. I just wanted a name. He refuses to give it. I think it's in my rights to ask for that information." (Dkt. 54 a 7.) McDonald explains to her, "this is a public meeting, where you can attend. You cannot say anything. You can't raise your hand. You can't do anything. So they're asking me to leave you—make you leave. So you need to leave." (Dkt. 54 at 7-8.) Plucinski

---

[5] The Complaint avers "Chairman Henggeler answered [Osborn] that he did wish to have her removed," and that Henggeler "then instructed Payette County Planning and Zoning Employee Mark Harvey to "fetch the Sergeant-at-Arms." Compl. ¶¶ 26-27.

[6] The verbal exchange between McDonald and Plucinski is in conversational tones.

responds, "Well, I'm not leaving. It's a public meeting." McDonald states, "Then you'll be arrested for trespassing." Plucinski answers, "That's fine." McDonald responds, "okay," and thereafter radios for assistance. (Dkt. 54 at 8.)

McDonald is heard, both on the video recording and on the audio recording of the dispatch call, saying: "If dispatch isn't busy, can you have them dispatch me a city officer to the courtroom?" He is told, "we have Toth up here, do you need my assistance?" McDonald responds, "No, a lady that's refusing to move. We're going to have to trespass her." (Dkt. 54 at 8, 11.)

According to the audio recording of the dispatch call[7] on October 9, 2014, Officer Toth received a call requesting a city officer to respond to the courtroom. He was told there was a "lady that is refusing to move, and we're going to have to trespass her."

Thereafter, an exchange takes place between McDonald and Plucinski prior to Toth's arrival:

| | |
|---|---|
| Plucinski: | I ain't trespassing on this property. |
| McDonald: | I understand. But they're asking you to leave, and you're refusing to leave. Then you're trespassing. |
| Plucinski: | It's a public meeting. |
| McDonald: | I understand that, but you're not supposed to speak. |
| Plucinski: | I'm done speaking. |
| McDonald: | Okay. Then leave. |
| Plucinski: | I'm listening. |
| McDonald: | Just leave. That's— |
| Plucinski: | I can't— |
| McDonald: | Do you understand what a trespassing complaint entails. You'll spend the night in jail. |
| Plucinski: | I'm sure ACLU will have a field day with that. |

---

[7] Exhibit 8 (Dkt. 43-2) contains an audio recording of the dispatch call to Officer Toth, and later, after Plucinski's arrest, a recording of a telephone conversation between Toth and Osborn. The Court had these audio recordings transcribed and placed into the record. (Dkt. 54.)

| | |
|---|---|
| McDonald: | I understand that ma'am. [Inaudible]. |
| Plucinski: | If you want to throw me in jail for all night and [inaudible], that's fine. |
| McDonald: | I would prefer not to throw you in jail. All you have to do is leave. |
| Plucinski: | I'm not leaving. |

(Dkt. 54 at 9.)

At this point, Officer Toth approached the Commissioners to speak with Osborn. Osborn informs Toth, "She was interfering with the public hearing. The chairman asked her to be quiet. She refused. So he asked her to [inaudible]." (Dkt. 54 at 9-10.) The minutes of the meeting also reflect that Toth spoke to Osborn at this point during the meeting, and Osborn advised Toth that Plucinski was being disruptive, had been asked to leave, and refused to leave. (Dkt. 43-8 at 12.) Later, during his deposition, Osborn testified that Toth asked Osborn if he could use the trespassing section, and Osborn indicated he could do so. Osborn Depo. at 56 (Dkt. 43-24 at 6.) Osborn recalls Toth asking him what he wanted done, and that he responded: "Remove her. That's all." *Id.*

Turning back to the video recording of the meeting, Toth proceeds to the back of the room, gesturing for Plucinski to accompany him. Plucinski responds audibly, "I'm not leaving." (Dkt. 54 at 10.)[8] Toth then approaches Plucinski and states, "okay, I'm placing you under arrest for not obeying a lawful order to leave," and he handcuffs Plucinski and escorts her from the room.[9] As Plucinski is handcuffed and escorted out of

---

[8] Plucinski earlier handed the phone to another person in the audience and asked her to continue recording.

[9] Plucinski mischaracterizes the exchange in her statement of disputed facts, claiming that Toth did not explain the nature of the charges against her before arresting her. SODF ¶ 18 (Dkt. 43-1 at 5.) The

the room, Plucinski loudly exclaims, "Boy I love how the public's treated in Payette County. Nice to know that you guys are looking out for our best interests. Thank you very much." (Dkt. 54 at 10.)[10]

The Commissioners continued their discussion about when it may be appropriate to request further documentation from individuals testifying at public meetings. (Dkt. 43-8 at 12.) Osborn provided information on the rights of the Commission to request documentation, and how it could proceed under such circumstances. The meeting adjourned at 8:19 p.m. (*Id.*)

Later that same evening, Toth called Osborn at his residence. The conversation follows:[11]

| | |
|---|---|
| Toth: | Sorry to bother you, Bert. This is Gary. Um… |
| Osborn: | Hi Gary. |
| Toth: | Isn't there a specific law about disrupting a public meeting? |
| Osborn: | Well you know, I— |
| Toth: | I couldn't find it. |
| Osborn: | You can't find it? |
| Toth: | No. So do you want to just trespass? |
| Osborn: | How do you--- |
| Toth: | Charge her with trespassing and— |
| Osborn: | Yeah, because she was told to leave. She was asked to leave. The deputy went in there and asked her to leave. |
| Toth: | Right. Okay. Well, you know, there's— somewhere in the back of my mind, there was something about disturbing a public meeting, but I can't find it, so— |

_____

audio recording and the transcription of the same indicates Toth stated he was arresting Plucinski for not obeying a lawful order to leave. (Dkt. 54 at 10.)

[10] The meeting minutes reflect Plucinski was placed under arrest and she "continued her vocal disruption as she was escorted from the meeting." (Dkt. 43-8 at 12.)

[11] Again, Plucinski's characterization of the ensuing conversation in her Statement of Disputed Facts and in the briefing leaves out the entirety of the conversation, and by doing so, mischaracterizes the dialogue. (Dkt. 43-1 at 6.)

**MEMORANDUM DECISION AND ORDER - 10**

| | |
|---|---|
| Osborn: | Well… |
| Toth: | Okay. I'll go trespass. She's still not giving us her—but we know who it is, but she's still [inaudible]— |
| Osborn: | Yeah, but if she's— |
| Toth: | —her name and date of birth. So she's going to be just not booked or anything, just held until then. So… |
| Osborn: | Well, if she's refusing to give her name, isn't that obstruct and delay? |
| Toth: | It will be obstruct and delay— |
| Osborn: | Okay. |
| Toth: | —a new charge too. |
| Osborn: | Okay. |
| Toth: | But she won't even be booked [on] anything until she cooperates. |
| Osborn: | Cool. |
| Toth: | So, anyway— okay. I just wanted to make sure. So I'll go ahead and go with trespass…And I'll put you down as a witness, too— in my case. |
| Osborn: | Actually, it's Chad Henggeler is the witness. |
| Toth: | Chad? |
| Osborn: | Henggeler. He's the chairman. He's the guy who has the authority— |
| Toth: | All right. |
| Osborn: | —to summons. |

***

| | |
|---|---|
| Toth: | And he's the one who asked her to leave when she wouldn't leave? |
| Osborn: | Right. |
| Toth: | What—I mean, what, was she, just being disruptive? Or… |
| Osborn:[12] | She's a spectator…And she has a right to testify at a public hearing, and she did that. And then so, I closed the public hearing. I'm in charge of that. I handed the meeting back to Chad Henggeler. He's the chairman. And so he's conducting the meeting of the planning and zoning commission. And, at the planning and zoning commission, it's a commission meeting. And those people talk. And one of the members was talking. And she interrupts, and she starts to—she wants to |

---

[12] Officer Toth's interruptions have been omitted from this passage. (Dkt. 54 at 15.)

| | |
|---|---|
| | argue. She raises a point of order. She has no business doing it. She's not a member of the Commission. |
| Toth: | Okay. |
| Osborn: | So I tell her she has no standing. "You interrupt the meeting. Please leave." |
| Toth: | So it had ended the public meeting, and now is in a—just a—what did you call that other meeting? |
| Osborn: | Well, that was a public hearing that she was allowed to testify at. |
| Toth: | Right. |
| Osborn: | And then it moved from the public hearing into the regularly scheduled planning and zoning commission meeting. |
| Toth: | Okay. |
| Osborn: | And that's the meeting where the commission members talk. |
| Toth: | Okay. Commission. |
| Osborn: | Uh-hum, commission meeting. |
| Toth: | And if they recognize somebody, then it's up to them on that. And— |
| Osborn: | Right. |
| Toth: | And Chad asked her to be quiet and she didn't. |
| Osborn: | Correct. |
| Toth: | And he asked her to leave, and she didn't? |
| Osborn: | Right. |
| Toth: | That's good enough. Okay. I just wanted to make sure I get all of my T's crossed. |
| Osborn: | That's fine. That's perfect. |
| Toth: | And then, like I said, I know there's—we'll just go trespass it. |
| Osborn: | I'll try to look for it tomorrow too. |
| Toth: | Okay. Good enough, Bert….Have a good night. |
| Osborn: | You too, bye-bye. |

(Dkt. 54 at 12-17.)

Toth prepared an incident report the night of October 9, 2014. (Toth Depo. at 51, Dkt. 43-14 at 8.) He classified the charges against Plucinski as criminal trespass in violation of Idaho Code § 18-7011, and resisting and obstructing officers, in violation of Idaho Code § 18-705. (Dkt. 43-13 at 2.) In his report, Toth indicated that, on October 9,

2014, he was dispatched to District Court Room 1 for a disturbance. *Id.* He was accompanied by Deputy Bullington. (Dkt. 35-2 at 10.)

> When I entered the courtroom I saw a female standing at the back of the courtroom against the north wall. Jailer McDonald was standing next to her. Sitting at a table was Attorney Bert Osborn. I met with Osborn and asked what needed to be done. He told me that the woman needed to leave. I asked Osborn if she did not, did he want her arrested and he said yes.
> I met with the woman and asked if she would leave the court room and she said no. I told her that she would be arrested and she still would not leave. I told the woman she was under arrest and placed her in handcuffs. I then escorted her to the jail. At the jail I asked the woman her name. She refused to give me that information…. I explained to the woman that if she did not cooperate she could not even be booked or processed by the jail staff. She still refused to give me that information.
> I returned to the court room…I was told by a person that was at the meeting he thought her name was Alma Plucinski.
> I contacted Bert Osborn by phone….In my phone conversation with Osborn it was decided that Plucinski would be charged with trespass and obstruct and delay of an officer.

(Dkt. 43-13 at 3.)

Plucinski was issued misdemeanor citation No. 38874 on October 9, 2014. (Dkt. 43-5 at 2.) The citation indicates it was issued to Alma Plucinski, a person having a home address of 2945 1st Ln. East. The citation indicated Plucinski would not provide her driver's license, social security number, vehicle license number, or other identifying information, stating, "subject would not cooperate with any of this information." (Dkt. 43-15 at 2.) The violations noted are "trespass to wit was asked by chair chad Heggler [sic] to leave 18-7011" and "obstruct & delay an officer 18-705." Also written on the

citation is the word, "Booked," and that Plucinski was "served." Plucinski did not sign the citation. The citation was later amended to reflect the correct Idaho Code citation for trespass, Idaho Code § 18-7008(8).

Toth later prepared a probable cause affidavit in Case No. 14-18806, *State v. Plucinski*. (Dkt. 43-16 at 2.) In the affidavit, Toth indicated Plucinski was arrested on October 9, 2014, at 20:45 p.m., for the crimes of trespass and obstruct and delay an officer, both misdemeanors, and that the crimes were committed in his presence. Toth set forth the reasons for probable cause in the affidavit, indicating he had been dispatched to District Court Room 1 at the Payette County Courthouse, and the Payette County Planning and Zoning Commission was having an official meeting. "During this time a female continued to interrupt the meeting and was asked by the Chairman to not interrupt when she refused she was told she needed to leave the courtroom. The woman refused to leave." (Probable Cause Affidavit, Dkt. 43-16 at 3.) The affidavit sets forth that Toth "met with the woman in the back of the court room….I told her that she needed to leave and she refused." *Id.*

Thereafter, Toth states in his affidavit that he:

> met with Burt Osborn who was in the meeting. Osborn told me that if she did not leave she was to be arrested. I arrested the woman on charges of trespassing for she had been told by the chair of the meeting to leave. I placed the woman in handcuffs and walked her to the jail. I asked the woman what her name was and she would not give me that information. I explained to her that she needed to cooperate with us or she would not be booked until she did. She still refused.

*Id.*

According to the police reports of Deputy McDonald and Deputy Bullington who assisted Toth, Plucinski was taken to the jail after her arrest. (Dkt. 35-2 at 9-10.) McDonald informed Plucinski that, if she would comply with the jail booking process and provide her personal identification information, he would book and release her. Plucinski refused to comply. *Id.* After repeated attempts, McDonald and Bullington had Plucinski change into jail provided clothes, and she was moved to Cell #3. *Id.* The Sheriff's Office Authorization to Detain form indicated Plucinski was detained at approximately 9:30 p.m. on October 9, 2014. (Dkt. 35-2 at 58.)

The court docket reflects an arraignment was scheduled on October 10, 2014, at 1:30 p.m., and Toth's affidavit of probable cause was filed with the court that same date. (Dkt. 43-17 at 3.) Plucinski was brought before Magistrate Judge Lee, who conducted the proceedings that morning, indicating on the record that "this isn't an arraignment, per se." (Dkt. 54 at 18.) Judge Lee explained he had been informed Plucinski had not completed the booking process. He then stated:

> My normal policy, Ms. Hasse -- and I probably -- other judges' policy too, I suspect. Until someone has been through the booking process and their identity and all that is resolved, I don't arraign someone. And it doesn't happen very often. Gratefully, we don't have that occur. Sometimes it happens because people are too impaired. They come into the jail impaired or something, and so they can't comply. And so there's a delay. Other times, people are deceptive about their identity, and so there's a delay injected into the process. The jail must -- the reason I don't arraign people before they have gone through the booking process is the jail must know who it is they're dealing with. I mean, that's not just for you, but for everyone.

(Dkt. 54 at 19.)

Judge Lee explained the booking process was not incriminating, and that he would conduct the arraignment once Plucinski completed the booking process. *Id.* at 20. Judge Lee further explained the fact that he recognized Plucinski was not enough, and that the booking process asked for a defendant's medical information, fingerprints, name, photographs, and identity for reasons of safety. *Id.* at 21.

The audio recording of the hearing that morning proceeds:

J. Lee:    So it's up to you to comply or not. But I wanted you to know that until you comply, I can't arraign you. And the unfortunate consequence of that is you would remain in jail, having no progress complete -- done on your case. I'm not ordering you to comply, per se. I'm hoping that you'll comply. And, understanding those things and understanding that the -- looking at the citation here, the citation is trespass and obstruct and delay. So, normally, on an obstruct and delay or trespass case, unless I perceive some special risk to an individual or something like that or if someone has a long history of not coming to court when ordered to do so, I simply release people on their own recognizance when I do those arraignments. And so that's probably what would happen in this case. And that's what I would typically do. Do you have questions about that, ma'am?

Pl.:    [No.]

J. Lee:    Alright. Are you willing to go through the book-in process so that I can get this arraignment done and so we can move forward?

Pl.:    I asked to speak to Richie Eppink, a very good friend of mine who is the legal director of the ACLU. And that's who I need to speak with.

J. Lee:    Well, and there's -- I'm not ordering that he not come here and talk with you. But I'm also not suspending the book-in process pending him coming to talk to you.

Pl:    Okay.

J. Lee:    All right. So we'll see you at 1:30, if you comply. If you don't, I suppose I'll talk to you on Tuesday. We have a holiday, unfortunately, on Monday. So, normally, I would do it on Monday, but there's a holiday. So court's not -- we won't be here. I will, ahead of that, if I don't go through the book-in

process, review the case for probable cause for the benefit of the jail. So anything else that we need to talk about right now?

At this point in the audio recording, the matter adjourned. (Dkt. 54 at 21 – 24.)

Judge Lee arraigned Plucinski four days later on Tuesday, October 14, 2014, at 1:30 p.m. (Dkt. 54 at 25.) The transcript of the audio follows:

J. Lee:    You may be seated, Ms. Hasse. We're on the record in 2014-1916, taking up State of Idaho v. Alma Plucinski, it says on the citation. We addressed that before. It's Ms. Alma Hasse. The -- I'm taking it up specially, ma'am, because we had spoken on Friday of last week. And you hadn't complied with the book-in process. And I normally don't arraign anybody until they have complied with the book-in process. I asked this morning if we knew. Deputy, it's my understanding that Ms. Hasse still hasn't complied with the book-in process; is that correct?

Deputy:    (Inaudible)

J. Lee:    All right. So, while I don't normally arraign someone until they have complied with the book-in process, what I'm going to do in this case, ma'am, is I'm going to go through an arraignment and try to deal with this maybe in a different way. So, ma'am, in this case, you have been issued a citation. The citation alleges an allegation of trespass and an allegation of obstruct and delay. The trespass alleges -- it just says: "Trespass, to wit: was asked by the Chair, Chad Henggeler, to leave." There's an affidavit of probable cause that explains that to a greater degree. It talks about an incident where there was a planning and zoning meeting. Mr. Henggeler is the chairperson of the planning and zoning meeting, apparently. And you disrupted the meeting, and so were instructed to leave, refused to leave, even after an officer was called, according to the affidavit of probable cause. And so the officer arrested you for trespass. And then you would not provide him -- would not cooperate him in the arrest process. And so he further charged you with obstructing and delaying an officer by -- in refusing to follow his instructions, his -- what he perceived to be his lawful instructions to leave the courthouse and other things like that, it sounds like. I found probable cause in support of those allegations on Friday of last week, believing, candidly, that I would be arraigning you on that on Friday of last week. That didn't happen, though, because of this book-in process

|        | situation. So trespass is a general misdemeanor that carries up to six months in jail and a $1,000 fine. Obstruct and delay is a misdemeanor that carries up to a year in jail and a $1,000 fine. Do you -- that doesn't mean those penalties would be imposed. That's just the maximum penalties. Do you understand these two charges? |
|--------|---|
| Pl.:   | I would like to have my attorney present. |
| J. Lee: | That's not my question. My question is: Do you understand the two allegations that have been made against you, the criminal allegations? |
| Pl.:   | I am remaining silent. |
| J. Lee: | All right. Well, I'm telling you that's the allegations. And I'm telling you what those penalties are. In a criminal proceeding, you have the right to remain silent as to the charges. You don't have the right to remain silent as to the -- as to answering questions relating to whether or not you have read rights forms, whether or not you understand what you're charged with, that kind of thing. But I'm trying to deescalate this thing, not escalate it. So I'm going to move forward, despite the fact that you're not answering the question. You do have the right to be represented by an attorney, even if you can't afford an attorney. If you can't afford an attorney, you can ask me to appoint one. You have the right to a trial by jury. You are presumed innocent during your trial. You have the right to confront and cross-examine any evidence the State might put on against you at a trial. You have the right to testify for yourself, if you choose to. You can give up your right to remain silent and testify, if you want to, but you don't have to. You have the right to compel others to appear at your trial at no expense to you, under the power of subpoena. You have the right to put defenses on during your trial, if you want to do that. Do you understand you have those rights? Are you not going to answer the question, ma'am? |
| Pl.:   | I'm going to remain silent. |
| J. Lee: | All right. So, normally, I ask people questions about their circumstances here with -- in the county and so forth, trying to determine how to set bond. Are you going to answer any of those questions? |
| Pl.:   | No. |
| J. Lee: | Okay. That makes it impossible for me to determine the risk of flight in this case. I do not have -- in the probable cause affidavit, I don't have information about criminal history and that kind of thing. So I just won't take that into account. But the |

fact that I can't gather information about, Ms. Hasse, your past history of failures to appear and your ties to the community and the details of your ties to the community and things like that, because of the nature of the charges and the affidavit alone, I'm going to set bond still, relative to the charges, relatively low, in the amount of $10,000. Should you post the bond, I'll require in addition -- as a term and condition of your release, in addition to posting the bond, that you must comply with the book-in process. You cannot be released from jail unless or until you comply with the book-in process. It's a condition of your release to comply. Do you want to -- are you going to hire an attorney, or are you asking me to appoint one to represent you?

Pl.:     I have an attorney.

J. Lee:     You have an attorney? All right. Okay. Well, do you have any questions for me, ma'am?

Pl.:     No.

J. Lee:     All right. Thank you.

With that, court adjourned. (Dkt. 54 at 25 – 30.)

The court set bond in the amount of $10,000, and ordered Plucinski to comply with the booking process as a condition of release. (Order for Commitment, Dkt. 35-2 at 65.) Plucinski substantially completed the booking process later that afternoon, although she remained in custody for two additional days. Def. Stmt. of Facts ¶ 25. (Dkt. 35-3 at 4.)

On Thursday, October 16, 2014, Plucinski appeared before Judge Lee again. (Dkt. 54 at 31.) The prosecutor[13] requested Plucinski be released and the bond vacated, on the grounds that Plucinski had completed the booking process, had no criminal record, and did not appear to be a flight risk. Def. Stmt. of Facts ¶ 26. (Dkt. 35-3 at 4.) Judge Lee

---

[13] Initially, city attorney Bert Osborn was appointed as prosecutor, but he was conflicted out as a witness. Def. Stmt. Of Facts ¶ 26. (Dkt. 35-3 at 4.)

granted the request and Plucinski was released from custody that afternoon. Plucinski Aff. ¶ 25. (Dkt. 43-25 at 7); Order to Release. (Dkt. 35-2 at 64.)

The criminal charges against Plucinski were later dismissed in return for Plucinski's written apology for her disruptive conduct at the October 9, 2014 meeting. Def. Stmt. Of Facts ¶ 28 (Dkt. 35-3 at 4; Dkt. 35-2 at 100.) The written apology, dated March 27, 2015, and signed by Plucinski, states as follows: "I would like to apologize for interrupting your meeting on October 9, 2014. I realize now that if I am to be an effective advocate, I must be respectful, and that includes not speaking out of turn." (Dkt. 35-2 at 100.) This lawsuit was filed on April 12, 2016.

## DISCUSSION

### 1.      Summary Judgment Standard

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "material" if it affects the outcome of the litigation and may be considered "genuine" if it is established by "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)); *see also British Motor Car Distrib. v. San Francisco Auto. Indus. Welfare Fund*, 883 F.2d 371 (9th Cir. 1989).

The Supreme Court of the United States has made it clear that summary judgment under Rule 56 is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to make such a showing on any essential element, "there can be no 'genuine issue of material fact,' since a complete[ ] failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323.

According to the United States Court of Appeals for the Ninth Circuit, to withstand a motion for summary judgment, a party

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car*, 882 F.2d at 374 (citation omitted). When applying this standard, the Court views all of the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Hughes v. United States*, 953 F.2d 531, 541 (9th Cir. 1992).

**2.      Section 1983 Standard**

"Section 1983 provides a cause of action for violations of a plaintiff's constitutional or other federal rights by persons acting under color of state law." *Summers v. City of McCall*, 84 F.Supp.3d 1126, 1146 (D. Idaho 2015) (citing *Nurre v. Whitehead*,

580 F.3d 1087, 1092 (9th Cir. 2009)). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000) (citing *Wyatt v. Cole*, 504 U.S. 158, 161 (1992)). To prevail on her § 1983 claim, Plucinski must show that (1) acts by the defendant, (2) under color of state law, (3) deprived her of federal rights, privileges, or immunities and (4) caused her damage. *See Wyatt,* 504 U.S. at 161 (citing *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163-64 (9th Cir. 2005)).

The parties do not dispute that Defendants were acting under the color of state law. The issue before the Court on these claims is whether the various defendants' acts deprived Plucinski of her federal rights, privileges, or immunities. Defendants argue Plucinski's constitutional rights were not violated by any Defendant, and alternatively claim they are entitled to qualified immunity. With regard to the state law claims, Defendants assert Plucinski has not carried her burden of proof to establish the elements of the various claims.

### 3.     First Amendment Violation

Plucinski asserts her First Amendment claim against Payette County, and against Chairman Henggeler and attorney Osborn in their individual capacities, based upon her ejectment from the Planning and Zoning Commission meeting on October 9, 2014. She argues the Commission and its officers engaged in viewpoint based enforcement of the rules of decorum, and that issues of fact exist precluding summary judgment.

Citizens are not entitled to exercise their First Amendment rights whenever and wherever they wish. *Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 269–70 (9th

Cir. 1995). There are three recognized categories of permissible regulation of expressive activity. First is the so-called public forum, such as a street or park. *Kindt*, 67 F.3d at 269. There are also nonpublic forums, which are "not by tradition or designation a forum for public communication." *Id.* In between lies the third category: the limited public forum. The state creates a limited public forum when it "open[s] for use by the public...a place for expressive activity." *Id.* at 269 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). Limited public forums are governed by the same standards as public forums. *Id.*

City council meetings, (like planning and zoning commission meetings), once open to public participation, are limited public forums. *Norse v. City of Santa Cruz*, 629 F.3d 966, 975 (9th Cir. 2010). A council can regulate the time, place and manner of speech, and also the content of speech, so long as content-based regulations are viewpoint neutral and enforced that way. *Norse*, 629 F.3d at 975. Even after the public comment period has closed, the meeting remains a limited public forum where citizens retain certain First Amendment rights. *Norse*, 629 F.3d at 975.

Removing an individual from a public meeting does not violate the Constitution, provided the individual is sufficiently disruptive and is not removed because of her views. *Kindt*, 67 F.3d at 271-72. A speaker may disrupt a council meeting by "speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies. The meeting is disrupted because the Council is prevented from accomplishing its business in a reasonably efficient manner." *White v. City of Norwalk*, 900 F.2d 1421, 1426 (9th Cir. 1990). In other words, citizens may be removed from public meetings when they are

disruptive and impede the orderly conduct of the Council meeting. *Norse*, 629 F.2d at 979 (Kozinski concurrence). Presiding officers are entitled to a "great deal of discretion" to determine whether speech is disruptive. *White*, 900 F.2d at 1426 & n.6.

Plucinski argues Henggeler and Osborn engaged in viewpoint based enforcement of the rules of decorum, because her ejectment was a result of the expression of her views concerning her prior protests of the proposed oil and gas treatment facility under consideration by the Commission. Plucinski argues Osborn, Morgan, and others hatched a plan to curtail Plucinski's alleged misinformation campaign and have her arrested for perjury, referencing the October 7, 2014 email exchange between the Planning and Zoning Commission's administrator and Osborn. *See supra*, n.2. As part of that plan, Plucinski asserts Morgan's comments during the October 9, 2014 meeting concerning his discussion with the City of Santa Barbara, which were made out of order, were intended to discredit her and her earlier public testimony from September 11, 2014, when she testified that the City of Santa Barbara did not allow rail traffic through town to transport hydrocarbon gas. Plucinski argues that, "when a public official personally attacks a citizen, and then responds to the citizen's attempt to defend him/herself by ordering the citizen's arrest, reasonable minds could differ as to the public official's motivations: i.e., decorum vs. viewpoint based animosity," citing *Monteiro v. City of Elizabeth*, 436 F.3d 397, 400 (3rd Cir. 2006) for support.

First, there is no dispute Plucinski was subject to restrictions on her speech, and Plucinski acknowledges the public comment period of the meeting had closed before her

outbursts. Hasse Decl. ¶ 10.[14] The Commission is entitled to limit public participation to preserve its legitimate interest in conducting efficient, orderly business. *See Kindt*, 67 F.3d at 271 (allowing reasonable time, place, and manner restrictions upon public commentary). Plucinski had spoken during the public portion of the meeting and therefore was not entitled to address Morgan's comments at the time they were made by him. *See Kindt*, 67 F.3d at 266 (affirming the district court's grant of summary judgment in favor of the rent control board, which had ejected a spectator from a public meeting for disrupting the proceedings by yelling and trying to speak when it was not time for discussion).

Plucinski argues, however, that the Commissioners deliberately strayed from the agenda to address her comments from a prior meeting, thereby creating a situation in which Plucinski was entitled to call for a point of order under "Robert's Rules of Order," citing *Monteiro* as an example. There are five flaws with Plucinski's argument. First, the broader topic of the conditional use permit application by Alta Mesa had been on the agenda for some time. A review of the Commission's agenda and the meeting minutes

---

[14] The rules established by the Board of County Commissioners and the County Planning and Zoning Commission permit citizens to testify or speak before the board, provided they have signed their name and written their address on a sign-up sheet. County Rules of Procedure § 1-7-2(B) (Dkt. 35-2 at 102.) Persons are not permitted to speak until they have been recognized by the hearing officer. County Rules of Procedure § 1-7-2(C) (Dkt. 35-2 at 103.) These rules apply during the public comment period of a board or commission meeting, including Planning and Zoning Commission meetings. Plucinski had spoken during the public comment period earlier. The disruption occurred later, after the public comment period had closed.

from October 9, 2014, and from September 11, 2014, reveals that Alta Mesa's conditional use permit application was an agenda item on both dates.[15]

Second, the discussion on October 9, 2014, concerning Plucinski's September 11, 2014 public testimony about the dangers of transporting hydrocarbon gas by rail, and Santa Barbara's alleged response to the same, appears in the meeting minutes under the heading of "other business,"[16] and is part of a broader discussion about topics germane to the conduct of the Commission's business. Pointedly, Morgan's comments were prefaced by Henggeler's comment that, at times, it may be prudent for the Commission to request documentation or verification from individuals testifying at public meetings, with Morgan providing an illustrative example. The discussion concluded with Osborn's comments about how the Commission could request and later review additional documentation from individuals testifying before it. This certainly appears to be an appropriate discussion item concerning the lawful conduct of the Commission's business, and the Court has found nothing which would prohibit the Commissioners from discussing matters which, in general, inform its decision-making.

Third, the court in *Kindt* expressly rejected a similar claim by a plaintiff who argued a governing board "'exceeded' its jurisdiction" by making announcements unrelated to the agenda item of rent control, thereby creating a situation in which Kindt had the right to "oppose the Board's views just as freely as if the parties were on a street

---

[15] Plucinski admits these facts as well.

[16] The agenda and the meeting minutes follow the same format and contain the same headings, titled "old business," "new business," and "other". (Dkt. 43-2 – 43-8.)

corner." *Kindt*, 67 F.3d at 272. Rejecting this argument, the court stated it was "an incorrect reading of the law regarding the meetings of public bodies. Even if the Board did have speakers from the community talk to it about the death penalty, the Greyhound bus strike, or the political regime in Cambodia, that did not give Kindt an unregulated right to respond in kind." *Kindt*, 67 F.3d at 272. The court differentiated between what a public body has the right to do "in private," or without public input, and what a public body chooses to open to discussion. *Id.* (citing *City of Madison*, *Joint Sch. Dist. No. 8 v. Wisconsin Emp. Relations Comm'n*, 429 U.S. 167, 177 (1976) (Stewart, J., concurring)). The court concluded that "public body meeting rooms [do not] metamorphose into street corners if the body adopts a nongermane resolution[; such an interpretation] defies common sense and logic, not to mention the need for civility and expedition in the carrying out of public business. Meetings of a public body do not become free-for-alls simply because the body goes beyond what a member of the public believes (even correctly) to be the body's proper purview." *Id.* In other words, the Commission has significant leeway to discuss matters germane to county government, which is what occurred here.

Fourth, Plucinski incorrectly interprets Robert's Rules of Order. According to these rules, a point of order may be called only by another member of the governing

body.[17] Plucinski was not a member of the Commission, and therefore had no authority to call a point of order. The record discloses that Plucinski interrupted the non-public portion of the meeting. "Restricting such behavior is the sort of time, place, and manner regulation that passes muster under the most stringent scrutiny for a public forum." *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004). Even if the Court considers Plucinski's interruption and resulting ejection from the meeting to be related to her opposing views, Henggeler's and Osborn's actions served the function of confining the discussion to a matter germane to the governance of the Commission, and not straying into a discussion about Plucinski's earlier testimony.

And finally, *Monteiro* bears no relation to the facts here. In that case, a city council member—not a member of the public—brought an action against the president of the city council, alleging his First Amendment rights were violated when he was ejected from the meeting. The city council had convened to discuss the city's proposed annual budget. Monteiro, a member of the city council, expressed his strong objections to the budget. Thereafter, the council president chose not to address the merits of the budget,

---

[17] *In Order When Another Has the Floor*. <u>After a member has been assigned the floor he cannot be interrupted by a member or the chairman</u>, except by (a) a motion to reconsider; (b) <u>a point of order</u>; an objection to the consideration of the question; (d) a call for the orders of the day when they are not being conformed to; (e) a question of privilege; (f) a request or demand that the question be divided when it consists of more than one independent resolution on different subjects; or (g) a parliamentary inquiry or a request for information that requires immediate answer; and these cannot interrupt him after he has actually commenced speaking unless the urgency is so great as to justify it. <u>The speaker (that is, the member entitled to the floor) does not lose his right to the floor by these interruptions, and the interrupting member does not obtain the floor thereby</u>, and after they have been attended to, the chair assigns him the floor again.

Roberts Rules of Order, Article I § 3 (underline added), http://www.rulesonline.com/rror-01.htm

but levied a "pointed attack at Monteiro for what she perceived to be his role in the distribution of a pamphlet protesting the budget and inviting citizens to attend the meeting." *Monteiro*, 436 F.3d at 400. Monteiro attempted to defend himself, and the president asked two officers to remove him from the meeting.

After a jury returned a verdict for the plaintiff, the appellate court affirmed the verdict. The court held the district court did not err in denying the defendant's motion for judgment as a matter of law. *Id.* at 406. The court affirmed the district court's determination that a reasonable jury could find the defendant had an unconstitutional motivation for ejecting Monteiro from the meeting—in other words, the president of the city council acted with an intent to suppress Monteiro's speech on the basis of viewpoint, in violation of the First Amendment. *Id.* at 405-406. The viewpoint in that case was Monteiro's expressed opposition to the budget proposal under consideration.

Here, unlike in *Monteiro*, Plucinski was not a county commissioner entitled to speak at the time she did. Even considering the background information Plucinski provided about the Commission's alleged attempt to smear Plucinski's good name, *see supra*, n.2, Plucinski did not express any particular viewpoint at the time she interrupted the meeting. Nor was Morgan commenting about Plucinski's opinions. Plucinski does not indicate she had ever been denied an opportunity to speak or address the Commission during the public portion of the meetings and express her opinions. And in fact, she had addressed the Commission during the public portion of the meeting that evening.

On the record before the Court, no reasonable minds could differ in the conclusion that Defendants were well within their discretion in seeking to remove Plucinski from the

meeting at the time they did so, and no First Amendment violation occurred. *See Kindt*,

67 F.3d at 272-73 ("Nothing indicates that Kindt was prevented from speaking his mind

on his chosen topics. Indeed, the Board's members regularly endured Kindt's philippics

and, essentially, restrained him only when he abandoned all sense of decorum. That is not

the stuff that First Amendment violations are made of.").[18]

### 4.    Unreasonable Seizure and False Arrest Under the Fourth Amendment and State Law

Plucinski asserts Defendants Toth, Osborn, and Henggeler deprived Plucinski of

her right to be free from unreasonable seizure as guaranteed by the Fourth Amendment of

the United States Constitution and under state law, on the grounds Officer Toth did not

have probable cause to arrest her for trespass.

The fundamental principle "of the Fourth Amendment is reasonableness. The

Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely

proscribes those which are unreasonable." *Morgan v. United States*, 323 F.3d 776, 780–

81 (9th Cir. 2003) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250, (1991)). To prevail on

her Section 1983 claim for false arrest, Plucinski must demonstrate there was no probable

cause to arrest her. *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir.

1998). The existence of probable cause is dispositive as to the false arrest claim. *Norse*,

629 F.3d at 978.

---

[18] Although not provided as justification for Defendants' arguments, the Court notes Plucinski later admitted in her March 27, 2015, letter that she had interrupted the meeting and spoke out of turn.

Probable cause for a warrantless arrest exists if, under the totality of the facts and circumstances known to the arresting officer, "a prudent person would have concluded that there was a fair probability that the suspect had committed a crime." *United States v. Struckman*, 603 F.3d 731, 739–40 (9th Cir. 2010) (quoting *United States v. Gonzales*, 749 F.2d 1329, 1337 (9th Cir. 1984)). The arresting officer must have "a reasonable belief, evaluated in light of the officer's experience and the practical considerations of everyday life, that a crime has been, is being, or is about to be committed." *Johnson v. Hawe*, 388 F.3d 676, 681 (9th Cir. 2004) (quoting *Hopkins v. City of Sierra Vista*, 931 F.2d 524, 527 (9th Cir. 1991)). A government official is entitled to qualified immunity on a false arrest claim if a reasonable officer in his position could have believed probable cause existed. *Norse*, 629 F.3d at 978.

Plucinski was cited for trespass.[19] The crime of trespass is committed when a person who has been notified verbally by the owner or authorized agent of the owner of real property to immediately depart the property and thereafter refuses to depart. Idaho Code § 18-7008(A)(8). A peace officer may make an arrest without a warrant for a public offense committed or attempted in his presence. Idaho Code § 19-603.

A violation of Idaho Code § 18-7008(A)(8) requires only that the defendant refuse to leave the property of another after being requested to do so by the owner or authorized agent. *State v. Missamore*, 803 P.2d 528, 533 (Idaho 1989). Prohibited conduct under the

---

[19] Although Plucinski was cited also for obstruction and delay of an officer, Plucinski arguments concern the trespass charge exclusively. The obstruct and delay charges were added later, because Plucinski failed to cooperate with the booking procedures.

statute is simply the act of remaining willfully on property belonging to another after having been asked to leave. *State v. Korsen*, 69 P.3d 126, 133 (Idaho 2003) (abrogated on other grounds by *Evans v. Michigan*, 568 U.S. 313 (2013)).[20]

Plucinski contends Osborn and Henggeler, in both their official and individual capacities, directed Toth to arrest Plucinski, and that because Toth did not actually witness the events that led to her arrest, Toth did not have probable cause to arrest her. In other words, Plucinski asserts Toth arrested her because Osborn told him to do so, and thereafter gathered facts in support of his probable cause affidavit, as well as fabricated probable cause based upon false information provided to him after her arrest.

Here again, the video recording speaks for itself. When Plucinski indicated she would not leave the meeting room, even after Osborn's request and Henggeler's summons of the sergeant-at-arms, both of which requests were made in the presence of a peace officer, Plucinski was subject to a charge under the statute. *Korsen*, 69 P.3d at 133. Here, the video recording clearly shows Plucinski interrupted the closed portion of the meeting. After Plucinski was first asked to leave, Henggeler directed Sergeant-at-Arms Mark Harvey to fetch Jailer McDonald. McDonald's audible conversation with Plucinski revealed he asked her if she was told to leave, she indicated she was, and that she refused. McDonald explained to Plucinski that, if she continued to remain on the property, she

---

[20] *Evans* concerned whether an acquittal, for double jeopardy purposes, includes a ruling by the court that the evidence is insufficient to convict. *Evans* does not disturb the *Korsen* court's findings with regard to the elements of trespass in Idaho.

would be arrested for trespassing. Plucinski refused to leave, and McDonald radioed for assistance.

Toth arrived soon after. The video reveals he spoke to both McDonald and Osborn before he approached Plucinski. When Toth did confront Plucinski, Toth is seen on the video gesturing for Plucinski to leave with him. Plucinski refused, retorting, "I'm not leaving." Toth then arrested her. The exchange between both McDonald and Plucinski, and later between Toth and Plucinski, are all the facts Toth needed to arrest Plucinski for trespass. The crime was committed in Toth's presence due to the following sequence of events: Toth learned from Osborn Plucinski had been asked to leave; Toth motioned for Plucinski to leave; Plucinski refused Toth's request; and thereafter, Toth explained he was placing her under arrest for not obeying a lawful order to leave. Given these undisputed facts, the Court finds Toth had probable cause to arrest Plucinski for trespass.

Plucinski contends Toth fabricated probable cause during the phone call with Osborn later that evening. However, from the video recording and the audio of the phone call between Toth and Osborn, it is apparent Toth was simply clarifying why Plucinski was asked to leave. Toth did not need to know the reason Plucinski was asked to leave at the time of her arrest. Plucinski was asked to leave not once, but three times – first by Osborn and Henggeler; later by McDonald; and then by Toth.

Even if the Court were to find the absence of probable cause, the Court agrees with Defendants' argument that Toth would be entitled to qualified immunity. An officer is entitled to immunity where a reasonable officer would believe that probable cause existed, even if that determination was a mistake. *Acosta v. City of Costa Mesa*, 718 F.3d

800, 826 n.14 (9th Cir. 2013). Here, Osborn and Henggeler directed Plucinski to leave the hearing room after she disrupted the meeting. Plucinski refused, and remained standing at the back of the room. Upon Toth's arrival, he approached Osborn at the front of the room. Osborn informed Toth of Plucinski's refusal to leave after having been asked to do so, noted Plucinski was still in the room, and under those facts, a reasonable officer would have believed probable cause existed to arrest Plucinski for a violation of Idaho Code § 18-7008(A)(8).

Plucinski next argues Osborn had no authority to ask Plucinski to leave, and that Henggeler, who did have authority, did not order her to leave. "By telling Toth that Henggeler instructed [Plucinski] to leave, Osborn ensured that the story met the statutory elements." Again, however, the facts salient to a finding of probable cause to arrest involve Toth approaching Osborn, verifying Plucinski was asked to leave, and observing Plucinski in the room; Toth motioning for Plucinski to leave; Plucinski refusing; and Toth's explanation to Plucinski that she would be placed under arrest for trespass. No other facts are relevant to the probable cause determination. At the very least, Toth was entitled to rely upon Osborn's apparent authority as the Commission's attorney to request a citizen's removal from the meeting.

Based upon the above, the Court declines to address Defendants' other qualified immunity arguments, and finds no disputed facts upon which a jury could conclude that a false arrest Fourth Amendment violation occurred. Therefore, there is no basis for Plucinski's Section 1983 claim.

**5.     False Imprisonment Under the Fourth Amendment and State Law – Claims Against the Individual Actors**

Plucinski asserts Osborn, Henggeler, and Toth violated her rights under the Fourth Amendment and state law to be protected from false imprisonment. First, Plucinski asserts Osborn and Henggeler brought about the arrest, or set in motion events that they knew would cause Plucinski to be arrested without probable cause, based upon their scheme to discredit Plucinski. As for Toth, Plucinski contends that, because the crime of trespass was not committed in his presence, Toth lacked probable cause to arrest her.

Based upon the Court's determination there was probable cause for the arrest, Plucinski's false imprisonment claims and corresponding claims against Osborn and Henggeler for directing the arrest fail. *See Vargas Ramirez v. U.S.*, 93 F.Supp.3d 1207, 1218 (W.D. Wash. 2015) ("[A] lawful seizure—for example, an arrest pursuant to a valid warrant—is a complete defense to a claim for false arrest.").

**6.     False Imprisonment Under the Fourth Amendment and State Law – Claim Against the County**

With regard to Plucinski's Fourth Amendment claim against the County, Plucinski contends her appearance before Judge Lee on Friday, October 10, 2014, the day after her arrest, did not satisfy her right to a prompt determination of probable cause, because her appearance was intended to coerce completion of the jail's booking process, not to determine probable cause. Plucinski argues the County's alleged custom, policy and practice to detain prisoners indefinitely until they voluntarily submit to booking procedures is unlawful. Plucinski argues that, when a probable cause finding is delayed beyond 48-hours, the burden shifts to the County to demonstrate "emergency or

extraordinary circumstances" that occasioned the delay, citing *Hallstrom v. City of Garden City*, 991 F.2d 1473 (1993), as support for her argument. Plucinski contends her stay in jail through the weekend was attributable to the County's unlawful policy or custom of indefinite detention to coerce compliance with the booking process.

Idaho Code § 19-615 specifies that, when an arrest is made without a warrant, "the person arrested must, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the arrest is made, and an information, stating the charge against the person, must be laid before such magistrate." To succeed on a claim of false imprisonment under the Fourth Amendment, Plucinski must show she was not brought before a judge within 48 hours of her arrest. *See Hallstrom v. City of Garden City*, 991 F.2d 1473, 1478-79 (9th Cir. 1993) (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)). A person taken before a judicial officer within the 48–hour period may still challenge the arresting officials for unreasonable delay, but she bears the burden of proving that "her probable cause determination was delayed unreasonably." *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1479 (9th Cir. 1993). After a 48–hour period has elapsed, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id*. at 1480. Intervening weekends and holidays do not provide justification for a delay. *Id*.

Officer Toth, and others employed by the County, were subject to a constitutional duty to ensure Plucinski was taken before a judicial officer promptly after her arrest. There is no dispute Plucinski was brought before Judge Lee on Friday morning, October 10, 2014, less than 24 hours after her arrest the prior evening. Judge Lee explained the

booking process, explained he would not arraign Plucinski until the booking process was complete, and expressed that he hoped to see Plucinski back in the courtroom at 1:30 that afternoon for the arraignment. Judge Lee explained also that, if Plucinski refused to complete the booking process before 1:30 p.m. that day, he would review the case for probable cause and see Plucinski on Tuesday for an arraignment.[21] In the meantime, Judge Lee informed Plucinski he would, nevertheless, review the affidavit of probable cause and make the required determination as of Friday, October 10, 2014. The probable cause affidavit reflected Judge Lee reviewed and approved it at approximately 3:00 p.m. that day. (Dkt. 59-1.)

Upon review of the written transcript of the various hearings before Judge Lee, Plucinski concedes that Judge Lee rendered a probable cause determination on October 10, 2014. (Dkt. 59 at 4.) Accordingly, Plucinski concedes summary judgment is properly granted in favor of the County on this claim.

**7.     Conditions of Confinement**

Plucinski asserts the conditions of her confinement post-arrest were unconstitutional. Plucinski argues Payette County's policy of detaining arrestees indefinitely until they voluntarily submit to the booking process constitutes punishment

---

[21] Idaho Code § 20-601, discussed *infra*, provides that persons who are arrested and taken to the county jail must submit to the entire booking process. Refusal to do so will result in detention until the process is completed. Toth charged Plucinski with a violation of Idaho Code § 17-705, which indicates it is a misdemeanor to "willfully resist[], delay[] or obstruct[] any public officer, in the discharge, or attempt to discharge, of any duty of his office…." Toth charged Plucinski with obstruct and delay of an officer for her refusal to complete the booking process.

in violation of the Fourteenth Amendment, relying upon *Hallstrom v. City of Garden City*, 991 F.2d 1473 (9th Cir. 1993). She contends that the excessive duration and the unacceptable conditions of confinement amount to punishment. *See Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979) (holding that, under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law).[22]

    As the Court explained above, Plucinski has failed to identify a policy the County contravened here. First, Plucinski was not "detained indefinitely" until she completed the booking process. Rather, county officers brought Plucinski before Magistrate Judge Lee within 24 hours of her arrest. On Friday, October 10, 2014, Judge Lee explained the booking process to Plucinski, and indicated he would conduct a probable cause determination in her absence if she did not complete the booking process prior to 1:30 p.m. that same day. Failure to do so, he explained, would result in her detention until Court reconvened on Tuesday afternoon (after the Monday holiday). Plucinski still had not complied by Tuesday, October 14, 2014. Judge Lee explained he could not release Plucinski until she completed the booking process, as he had no information with which to determine Plucinski's risk of flight. Judge Lee imposed bond, and a condition of release that she complete the booking process. Once Plucinski completed the booking

---

[22] Plucinski does not allege a Fourteenth Amendment conditions of confinement violation in the Complaint. The only time Plucinski mentions her conditions of confinement is in the context of her claims under the Fourth Amendment, in that she alleges her false arrest led to her being incarcerated under conditions she found distressing. Accordingly, any attempt to raise a Fourteenth Amendment conditions of confinement claim now are denied as contrary to the Court's scheduling order, which required amended pleadings by October 7, 2016. (Dkt. 23.)

process, the prosecutor brought Plucinski before Judge Lee on October 16, 2014, requested that she be released, and Judge Lee ordered her release.

Plucinski appears to ignore the role of Judge Lee and the purpose of the booking process under state law. Idaho Code § 20-601 provides that a person who is arrested and taken to a county jail:

> shall submit to the entire booking process, to include, but not be limited to, having his or her photograph taken and his or her fingerprints recorded. Any person who refuses to submit to the entire booking process will be held in the county jail until the process is completed, or until ordered to be released by a magistrate or district judge. A person held under this section shall be taken before a magistrate at the next scheduled first appearance time, but shall not be released until either the entire booking process is completed or the judge orders the release.

The legitimate government interest served by booking procedures is "well established: the need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody. It is beyond dispute that 'probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest.'" *Maryland v. King*, 569 U.S. 435, ___, 133 S. Ct. 1958, 1970 (2013). Next, "law enforcement officers bear a responsibility for ensuring that the custody of an arrestee does not create inordinate 'risks for facility staff, for the existing detainee population, and for a new detainee.'" *Maryland v. King*, 133 S. Ct. at 1972. Third, "the Government has a substantial interest in ensuring that persons accused of crimes are available for trials." *Id.* at 1972-73. And last, "an arrestee's past conduct is essential to an assessment of the danger he poses to the public, and this will inform a court's determination whether the

individual should be released on bail. 'The government's interest in preventing crime by arrestees is both legitimate and compelling.'" *Id.* at 1973.

Plucinski asserts the process she received was similar to that received by the plaintiff in *Hallstrom v. City of Garden City*, 991 F.2d 1473 (9th Cir. 1993). It was not. While it is true Hallstrom refused to comply with booking procedures, Hallstrom was denied access to a magistrate judge, at the hands of county officials who refused to bring her before a judge after an arrest on a minor traffic violation unless she complied with the booking process. The court took issue with the *officers'* failure to arrange a hearing until four days after Hallstrom's arrest, and noted "the detention itself (and her lack of access to a magistrate or release on bail) could be punishment for failing to cooperate." *Hallstrom*, 991 F.2d at 1481, 1485.

These are not the facts here. Officers brought Plucinski before Judge Lee less than 24 hours after her arrest and the commencement of her detention. Judge Lee explained the booking process, explained he would determine probable cause to detain her, and explained that, until the booking process was complete, he would not conduct an arraignment. Plucinski refused to cooperate. Later, during her arraignment, Plucinski again refused to cooperate, by not answering the Court's questions. Judge Lee ordered, as a condition of her release, that Plucinski complete the booking process. Plucinski was detained until she cooperated with the Judge's order. Upon her cooperation, she was released.

Because Plucinski received a prompt determination of probable cause by Judge Lee, and he ordered her to complete the booking process as a condition of release, the

detention was not punishment for Plucinski's failure to cooperate. No reasonable jury could find the facts otherwise—there was no constitutional violation.

8.     **Denial of Due Process – Malicious Prosecution in Violation of the Fourteenth Amendment and State Law**

Plucinski asserts this claim against Osborn for his role in "telling Toth to arrest Hasse and then providing Toth with false information for Toth's probable cause affidavit." In other words, Plucinski contends Osborn, in his role as the county prosecutor, orchestrated Plucinski's unlawful warrantless arrest, and provided false information to Toth to substantiate the charges brought against her.

For Plucinski to survive summary judgment on this claim, she must present evidence that Osborn "prosecuted her with malice and without probable cause, and that [he] did so for the purpose of denying her equal protection or another specific constitutional right." *Freeman v. City of Santa Ana,* 68 F.3d 1180, 1189 (9th Cir. 1995). Although, in general, "a claim of malicious prosecution is not cognizable under § 1983,…'[the Ninth Circuit has] also held that an exception exists…when a malicious prosecution is conducted with the intent to…subject a person to a denial of constitutional rights.'" *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 919 (9th Cir. 2012) (quoting *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985) (*en banc*)).

Although Plucinski alleges Osborn acted with the intent to deprive her of constitutional rights, Plucinski cannot show she was prosecuted without probable cause. *See Brown v. Selfridge*, 224 U.S. 189, 192 (1912) (holding that the plaintiff bears the burden of proving malice and lack of probable cause). In support of her malicious

prosecution claim, Plucinski merely alleges that Officer Toth lacked probable cause to arrest her and violated her constitutional rights with an unlawful seizure based upon what Osborn told him. But, as discussed above, the Court (as did Magistrate Judge Lee) has found Officer Toth had probable cause to arrest Plucinski for trespass. Plucinski has made no other showing in support of her claim. Defendants are entitled to summary judgment on Plucinski's malicious prosecution claim.

Plucinski appears also to assert a separate claim based upon the charge of obstruction and delay of an officer. She asserts "Osborn instructed Toth to add an obstruction charge when Hasse failed to provide the information Toth needed to cite Hasse after her arrest, even though Toth had information required to complete Hasse's citation." This claim is based upon the conversation Toth had with Osborn the evening of October 9, 2014. Plucinski interprets the conversation as Osborn instructing Toth to add the charge, knowing there was no probable cause to do so.

Here, the undisputed facts could have led a reasonable officer to believe probable cause existed to arrest Plucinski for resisting and obstructing an officer in violation of Idaho Code § 18-705.[23] Resisting and Obstructing is a misdemeanor offense that requires proof of three elements: (1) willful resistance, delay, or obstruction of an officer's duties; (2) the person resisting knew that the other person was an officer, and (3) the resisting

---

[23] Idaho Code § 18-705 states: "Every person who willfully resists, delays or obstructs any public officer, in the discharge, or attempt to discharge, of any duty of his office or who knowingly gives a false report to any peace officer…is punishable by a fine not exceeding one thousand dollars ($1,000), and imprisonment in the county jail not exceeding one (1) year."

person also knew at the time of the resistance that the officer was attempting to perform an official act or duty. *State v. Adams*, 67 P.3d 103, 108 (Idaho Ct. App. 2003).

Toth charged Plucinski with obstruct and delay of an officer due to Plucinski's refusal to complete the booking process. Toth explained to Osborn that Plucinski was refusing to give her name and date of birth. Toth confirmed such conduct constituted obstruct and delay, an additional charge, and that Plucinski would not be booked until she cooperated. Toth in his affidavit explained Plucinski refused to cooperate once at the jail, and he had to re-visit the Commissioner's meeting room to even learn her name. As explained above, the booking process serves legitimate state interests, and Idaho law requires compliance with the entire booking process by persons who are arrested. Further, Judge Lee determined there was probable cause to support the charge. Plucinski continued to obstruct and delay the criminal proceedings, refusing to answer Judge Lee's questions in open court.

Based upon Plucinski's indisputable conduct, no reasonable jury could conclude Officer Toth lacked probable cause to support the obstruct and delay charges in the citation, or that Plucinski's continued detention was anything other than a result of her own refusal to cooperate contrary to the court's direction to do so. Therefore, the addition of the charge for obstruct and delay did not violate Plucinski's constitutional rights, and Defendants will be granted summary judgment on the malicious prosecution claim.

**9.      Intentional Infliction of Emotional Distress**

Plucinski argues Toth and Osborn's collective conduct in causing her to be arrested without probable cause, and their later fabrication of information to support a

probable cause affidavit, constitutes extreme and outrageous conduct supportive of her claim for emotional distress. Additionally, she contends the conditions of her confinement were such as to cause her emotional distress. Defendants argue Plucinski has not alleged facts to support the elements of a claim for emotional distress.

In Idaho, four elements are necessary to establish a claim of intentional infliction of emotional distress: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Edmondson v. Shearer Lumber Prod.*, 139 Idaho 172, 179–80, 75 P.3d 733, 740–41 (2003) (citing *Curtis v. Firth*, 123 Idaho 598, 601, 850 P.2d 749, 751 (1993)). Justification for an award of damages for emotional distress seems to lie not in whether distress was actually suffered by a plaintiff, but rather the quantum of outrageousness of the defendant's conduct. *Brown v. Fritz*, 108 Idaho 357, 362, 699 P.2d 1371, 1376 (1985). "Although a plaintiff may in fact have suffered extreme emotional distress ... no damages are awarded in the absence of extreme and outrageous conduct by a defendant." *Id.* Courts have required very extreme conduct before awarding damages for the intentional infliction of emotional distress. *See Rasmuson v. Walker Bank & Trust Co.*, 102 Idaho 95, 100, 625 P.2d 1098, 1103 (1981).

Summary judgment is proper when the facts allege conduct of the defendant that could not reasonably be regarded as so extreme and outrageous as to permit recovery for intentional or reckless infliction of emotional distress.

> It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

Restatement (Second) of Torts, § 46 comment h (1965).

Based upon the Court's findings that no constitutional violations occurred, and that no reasonable jury could conclude otherwise, the Court finds summary judgment proper on the claim for emotional distress. No extreme conduct occurred here. Moreover, Judge Lee explained that, if Plaintiff completed the booking process, he would have released her at her arraignment, which was initially scheduled for 1:30 p.m. on Friday, the day after her arrest. Plucinski would have been released less than 24 hours after her initial arrest had she cooperated with the court and the jail. Yet Plucinski refused to do so, thereby extending the period of her confinement.

## CONCLUSION

Upon consideration of the undisputed facts and applicable law, the Court concludes summary judgment is properly granted to Defendants. The Court does not reach the additional arguments raised by the parties, because a finding in the first instance of no constitutional violations in this Section 1983 action eliminates the need to do so.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

Defendants' Motion for Summary Judgment (Dkt. 35) is **GRANTED**, and judgment will be entered in favor of Defendants on all claims asserted in the Complaint.

DATED: March 16, 2018

Honorable Candy W. Dale
United States Magistrate Judge